IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2022

## IN RE HOPE H. ET AL.[1]

**Appeal from the Juvenile Court for Fentress County**
**No. 2019-JV-30; No. 2019-JV-7  Michael Todd Burnett, Judge**

_____

### No. M2021-00513-COA-R3-PT; M2021-00519-COA-R3-PT

_____

The mother of nine minor children appeals the termination of her parental rights. Two petitions for termination of parental rights are at issue in this appeal. The first was filed by the Tennessee Department of Children's Services ("DCS") to terminate the mother's parental rights to seven of her children who were in DCS custody. A second petition, filed by maternal cousins, sought to terminate her parental rights to two of her children who were in the cousins' custody. Following a trial on both petitions, the juvenile court found that grounds for termination had been established and that termination of the mother's parental rights was in the children's best interests. On appeal, the mother contends that no grounds for termination were proven and that termination of her parental rights is not in the children's best interests. We affirm the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Jonathan R. Hamby, Crossville, Tennessee, for the appellant, Amy H.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Barker and Courtney J. Mohan, Assistant Attorneys General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Tyler W. Lannom, Cookeville, Tennessee, for the appellees, Matthew H. and Amelia H.

Evan M. Wright, guardian ad litem, Jamestown, Tennessee, for the appellee, Hope H.

### OPINION

_____
[1] This court has a policy of protecting the identity of children by initializing the last names of the parents and child.

# FACTS AND PROCEDURAL HISTORY

Amy H. ("Mother") and Timothy H. ("Father") are the parents of ten children: Josiah, Jonathan, Nehemiah, Hadassah, Nathaniel, Noah, Obadiah, Grace, Hope, and Malachi. In April 2017, DCS received a referral alleging, *inter alia*, that Mother was having a mental breakdown and both parents were physically abusing the children.

A few days later, a DCS caseworker, Brittany Massey, met with five of the ten children at their school. At this point, one of the older children, Josiah, disclosed to Ms. Massey that he and his siblings were being neglected and regularly beaten by Mother and Father. Thereafter, Ms. Massey made several unsuccessful attempts to visit the family home.

Subsequently, she met with Mother, Father, and several of the children at a public library. During this meeting, Ms. Massey interviewed Mother, who stated that the family shared a two-bedroom, one-bath trailer. Because the initial report alleged that one of the children, eleven-year-old Hadassah, could not read or write, Ms. Massey asked Hadassah to read from a workbook that Mother, who claimed to be homeschooling Hadassah, had given her. According to Ms. Massey, Hadassah could only read the first few words and then began crying. Ms. Massey noted that Hadassah's education did not appear to be at an age-appropriate level.

The following day, Ms. Massey visited with the family in their trailer. During this visit, Ms. Massey was unable to speak alone with any of the younger children due to the lack of space in the trailer. In her discussions with Mother, however, Mother did not disclose any physical abuse of either herself or any of the children at any time.

Although Mother had just denied any physical abuse in the home, a few days after meeting with Ms. Massey, Mother filed for an order of protection against Father based on allegations that Father was verbally and physically abusive to her and the children. The court granted the order of protection in May 2017.

Shortly after the hearing on the order of protection, Ms. Massey attempted to reach out to Mother to determine where she and the children were living; however, her attempts to contact or locate Mother were unsuccessful.[2]

Several days later, Mother sent a written statement to the court requesting that the order of protection be dismissed, for which a hearing was set. Ms. Massey attended the hearing. After hearing testimony from Mother and others, the court, sua sponte, ordered

---

[2] Ms. Massey later learned that Mother and the children had temporarily moved into a domestic violence shelter.

the children to be placed into DCS custody.[3]

Pursuant to an order of protection entered on June 14, 2017, due to dependency and neglect, Hope and Malachi were placed in the custody of relatives, Amelia and Matthew H. The other seven minor children were placed in the custody of DCS. It was not until the children were taken into DCS custody that DCS learned the full extent of the abuse, which occurred while the family previously resided in California and following their move to Tennessee.

*California*

Prior to living in Tennessee, the family lived in California, where, according to the older children, much of the abuse occurred. During the family's time in California, the four oldest children disclosed to Mother and Father that they had been molested by babysitters. In response, Mother and Father claimed that God told them the older boys were molesting one another along with their sister, Hadassah. For this reason, Mother and Father began beating the children and using religion to justify the beatings.

At night, Mother and Father would lock the older boys in separate closets in order to keep them from touching each other or Hadassah. Mother and Father later put alarms on each of the closet doors and would block the closet doors with furniture. Nevertheless, both parents continued to believe that the older boys were escaping during the night and touching one another. According to the older boys, Mother and Father would repeatedly question the boys about how they had escaped. When the boys denied escaping, Mother and Father would hit them until they ultimately told fabricated stories about their alleged escapes.

Father would beat the older boys multiple times a day by various means. The older children recalled Father using a board, rods, sticks, and his hands. When the board broke, Father would use a metal spoon. In an effort to conceal the abuse, Mother and Father would take the children into various "noise-blocking" areas of the home, such as the shower, to hide the children's cries and screams. Mother also actively participated in the beatings. Mother would participate in spankings that resulted in bleeding. Nehemiah recalled Mother hitting him in the face with a ruler and a spatula, which caused cuts across his face. Nehemiah also recalled telling Mother during one of the beatings that his buttock was bleeding. Mother responded by telling him that she would "try to hit the other side." As punishment, Mother would also make Hadassah slap her brothers. Mother was also present when Father beat them and would encourage him to do so.

Mother and Father also made specific efforts to cover up the abuse. The boys recalled that their backs and thighs were often incredibly painful to the touch and covered

---

[3] At this point, none of the children had reached the age of majority.

in bruises. The boys indicated that Father would routinely hit the same bruises in order to hide the continued abuse. In another effort to cover up the abuse, Mother and Father would also direct the children to wear certain clothing in order to hide the bruises when the family went to church. Nehemiah also recounted an instance in which his hand was so badly beaten that it turned purple and became very swollen. In order to conceal the cause of the injury, Mother instructed Nehemiah to tell others that his brother had accidentally hit his hand with a bat if anyone asked how the injury had occurred.

Even more, both parents would regularly question the older boys about molesting their siblings and beat them until they falsely confessed. In an effort to lessen the abuse, the older boys began falsely confessing because, in their opinion, the beatings were less severe when they confessed. Similarly, Mother and Father threatened Hadassah until she began falsely accusing the older boys of touching her. The older boys disclosed that, during the day, Mother would force them to wear wetsuits, which Mother would sew shut in order to prevent them from touching each other. Because the suits were sewn shut, they prevented the boys from using the restroom during the day. The boys described the suits as being uncomfortable and hot. According to the older children, Father would take the wetsuits off and beat the boys once he returned home from work. Mother would also routinely lock the boys outside of the home all day in order to separate them from their younger siblings. In one instance, Mother smeared human feces on one of the boy's face. At trial, each of the older boys denied ever touching one another, and Hadassah denied ever being touched.

*Tennessee*

In 2014, the family moved from California to Tennessee. Upon moving to Tennessee, the family first lived in a house before moving to the trailer Ms. Massey visited.

The children described the house as crowded and recalled that it smelled "horrific." Rat feces was all over the house, including on the dishes and in the children's beds. The cabinets were infested with ants. Trash would pile up in the garage. At trial, Mother asserted that the trash was only kept in the detached garage, but she admitted that rats ultimately came into the home as a result of the unsanitary conditions. Eventually, the family was evicted from the home, at which point they lived in various places. At one point the family was staying in a church parking lot before moving into the church fellowship hall. The family then moved into the one-bedroom trailer.

Although Ms. Massey noted that the trailer was clean during her one visit, the children described it as often being crowded and dirty. Due to the cramped conditions in the trailer, there were not enough beds for all of the children; thus, most of them slept on mats on the floor. The older children also indicated that they were often unable to shower and lacked any clean clothes or food. Though Mother and Father had Electronic Benefits Transfer (EBT) funds, the parents would often use the funds to provide other church families with food while leaving their own children without food.

Moreover, though some of the younger children stated that the physical abuse lessened after the family moved to Tennessee, the older children recounted certain physical altercations with Father after relocating to Tennessee. Specifically, Father once grabbed Nehemiah's throat and choked him until he could not breathe. In another instance, Father aggressively grabbed Nehemiah. Similarly, there were physical altercations between Josiah and Father. Josiah testified that Father ran at him with a shopping cart while in a Walmart parking lot and pushed him against the car, yelling in his face and spitting on him. Nehemiah and Josiah stated that Mother was present for each of these incidents.

Apart from the physical abuse, the older children also testified that Mother and Father's seemingly never-ending fighting ultimately harmed them. Mother and Father fought nearly every day and exposed the children to their arguments. The older children testified that they would hear the parents fighting throughout the night. Because the parents fought often, the older children stated that they had no choice but to take care of the younger siblings. The older children would have to calm the younger children, feed them, get them ready for bed, and do their best to keep them clean. According to Josiah, the continued fighting, poor living conditions, and abuse prompted him to move in with his grandparents. Ultimately, the fighting affected the children's sleep and stress levels, caused depression, led to difficulty focusing, and often made the older children late to school.

The school-aged children testified that Mother and Father also neglected their education. For most of their childhoods, the older children did not go to school and had very minimal homeschooling. After moving to Tennessee, the parents enrolled the four oldest boys in school, but they did not enroll Hadassah. According to Mother, she believed Hadassah was not ready for school and would be behind her classmates. Mother claimed that she homeschooled Hadassah; however, Ms. Massey discovered that, at eleven years old, Hadassah was not at grade level in any subject. Significantly, when Hadassah was tested in the fall of 2017, she performed very poorly, testing in the fourth percentile for reading and the second percentile for math. Ms. Tammy Norman, an assistant principal who provided expert testimony regarding elementary education, testified that Hadassah was severely delayed. According to Hadassah, Mother would tell her that she would enroll Hadassah in school the following year, but Mother never did. Instead, Hadassah stayed home and was largely responsible for caring for her younger siblings.

As for the older boys, they continued to be late for school as a result of Mother and Father's conduct. Mother and Father instructed the boys not to reveal why they were continually late to school because "what happened in the house" needed to be "kept in the house." The older children recalled that Mother would scare them into not disclosing the abuse or neglect by telling them that DCS would take them to jail and that they would be raped in jail. Thus, the children never disclosed what happened at home before meeting Ms. Massey.

As previously discussed, the children were removed from Mother and Father's

custody in June 2017. After the children's removal, Mother completed an initial parenting and psychological evaluation with Jeffrey Scott Herman. At trial, Mr. Herman testified that he had recommended Mother be treated with a course of psychotherapy and that he was initially optimistic about the possibility of reunification. Mr. Herman, however, changed his opinion regarding reunification after conducting similar psychological evaluations on each of the children. Significantly, Mr. Herman noted that Mother had not disclosed the extent of the abuse or the extent of her involvement in the abuse. Moreover, Mr. Herman stated that several of the children were "adamant" that they did not want to work toward reunification with either parent. Significantly, Jonathan's therapist, Mr. Hill, testified that Jonathan believed he could not live the life he truly wanted to live until he knew that reunification with his parents was not possible.

In February 2018, Mr. Herman wrote a letter to DCS in which he detailed his concerns regarding reunification and expressed that he was pessimistic about the possibility of successful reunification. Mr. Herman wrote that Mother's continued efforts to conceal the extent of the abuse and her declining to be completely transparent to him about the extent of the abuse were "major red flag[s]." According to him, Mother's continued efforts to conceal the abuse demonstrated that Mother willfully abused the children and would not take responsibility for the abuse such that she could be completely rehabilitated.

*Dependency and Neglect Proceedings*

On November 8, 2018, the Circuit Court of Fentress County adjudicated all of the children dependent and neglected. More significantly, the circuit court found that Mother and Father severely abused Josiah, Nehemiah, Jonathan, and Hadassah. Although the circuit court's decision was on appeal when the petitions for termination were filed, this court affirmed the circuit court in a decision filed on July 8, 2020, *In re Nehemiah H.*, No. M2019-01167-COA-R3-JV, 2020 WL 3885956 (Tenn. Ct. App. July 8, 2020). In that decision we stated: "[W]e determine that the evidence presented supports the trial court's finding, by clear and convincing evidence, that Mother committed severe child abuse against the Children. Mother participated in and failed to protect the Children from abuse that was likely to and did cause serious bodily injury and severe depression in the Children." *Id.* at *10.

As is discussed in more detail below, the trial court incorporated our decision from the dependency and neglect action into its final orders in these termination proceedings.

*Termination Proceedings*

On January 16, 2019, DCS filed a petition to terminate the parental rights of Mother and Father to seven of their children—Jonathan, Nehemiah, Hadassah, Noah, Nathaniel, Grace, and Obadiah—on the ground of severe child abuse. The petition also alleged that the seven children had been living with their grandparents, Robyn and Freddie T., who

wished to adopt them.

One month later, on February 8, 2019, Amelia and Matthew H. filed a separate petition to terminate the parental rights of Mother and Father to the other two minor children, Hope and Malachi, who had been residing with them since June 2017. In addition to the ground of severe child abuse, the petition alleged the grounds of persistence of conditions. The petition also sought adoption.

Upon motions of the petitioners and pursuant to an order entered on March 18, 2019, the two petitions were "consolidated for purposes of all future proceedings and trial."[4] The petitions were tried together before the juvenile court over eleven days, beginning on September 10, 2019, and lasting through January 31, 2020.[5] At trial, the juvenile court heard testimony from Ms. Massey, Mother, Father, Amelia H., Matthew H., Josiah, Nehemiah, Hadassah, Jonathan, Mother's therapist, the children's therapists, and the children's grandparents. The court also heard and considered testimony from Mother's sister, Mother's stepsister, Mother's stepbrother, Mother's pastor, and Mother's friends. At the conclusion of the trial, the court announced that it would be granting both petitions to terminate Mother and Father's parental rights.

In the order filed in the DCS action, the juvenile court found that DCS had established the ground of severe child abuse as to Jonathan, Hadassah, Noah, Nathaniel, Grace, and Obadiah, and that termination was in their best interests.[6] In the other action, the court found that Amelia and Matthew H. had established two grounds—the grounds of severe abuse and persistence of conditions—as to Hope and Malachi, and that termination was in their best interests. Both orders were entered on April 16, 2021.

Mother filed a timely appeal on May 21, 2021. Father did not appeal.

---

[4] Nevertheless, the court elected to address the termination of the parental rights in two separate orders. The final order in the DCS action was entered in case number 2019-JV-7. The other final order was entered in case number 2019-JV-30.

[5] The trial court heard both petitions together after it determined that both cases involved a common question of law and fact and that the proof to support both petitions would be largely the same. *See* Tenn. R. Civ. P. 42.01 ("When actions involving a common question of law or fact are pending before a court, the court may order all the actions consolidated or heard jointly . . . .").

[6] As previously discussed, Josiah reached the age of majority prior to DCS filing the petition to terminate the parents' rights. Nehemiah reached the age of majority prior to the court's final written order. Thus, the court's final order did not apply to the two oldest boys. *See* Tenn. Code Ann. § 36-1-113(a) (granting courts jurisdiction to "terminate parental . . . rights to a child"); *see also* Tenn. Code Ann. § 36-1-102(13) (defining a child as "any person . . . under eighteen (18) years of age"). Jonathan reached the age of majority shortly after Mother filed this appeal.

ISSUES

Mother raises three issues on appeal, stated as follows:

I.      Whether the court erred in finding that the children were victims of severe abuse.

II.     Whether the court erred in finding that there was clear and convincing evidence that Mother had failed to correct conditions that led to the children's removal.

III.    Whether the trial court erred in finding that termination of Mother's parental rights was in the best interest of the children.

## STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). "[T]his right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).

"To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016).

In an appeal, "this [c]ourt is required 'to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests.'" *In re Connor B.*, 603 S.W.3d 773, 779 (Tenn. Ct. App. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 525). In doing so, we must determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Stated another way, we must make our own "determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524.

The trial court's findings of fact are reviewed de novo upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d at 523–24; *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524. A trial court's determinations regarding witness credibility are entitled to great weight on appeal and will not be disturbed absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

## ANALYSIS

### I. GROUNDS FOR TERMINATION

### A. Severe Child Abuse

Mother contends the trial court erred by relying on a previous court order—the 2018 final order of the circuit court in the dependency and neglect action—to find the ground of severe child abuse had been established.[7] We respectfully disagree.

A trial court may terminate a parent's rights if the parent

> has been found to have committed severe child abuse, as defined in § 37-1-102, **under any prior order of a court** or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child.

Tenn. Code Ann. § 36-1-113(g)(4) (emphasis added).

Contrary to Mother's contention, the ground of severe child abuse is subject to the doctrine of res judicata in a termination of parental rights proceeding, "prevent[ing] a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action." *In re S.S.*, No. E2021-00761-COA-R3-PT, 2022 WL 1151424, at *6 (Tenn. Ct. App. Apr. 19, 2022) (citing *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016)).

> The doctrine of res judicata applies when "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial

---

[7] This ground was alleged in both petitions and the court found it had been established by DCS and Amelia and Matthew H.

tribunal of concurrent jurisdiction."

*In re Raylan W.*, No. M2020-00102-COA-R3-PT, 2020 WL 4919797, at *12 (Tenn. Ct. App. Aug. 20, 2020) (quoting *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010)).

In its 2018 final order in the dependency and neglect action, the Circuit Court for Fentress County found that Mother had subjected her children to severe abuse. Although the appeal of that decision was pending when the petitions were filed in this matter, the appeal concluded in April 2021, prior to the entry of the final orders in these termination proceedings. Specifically, this court affirmed the 2018 finding of severe abuse in the dependency and neglect action, and our decision became final and non-appealable when the mandate was issued on September 25, 2020. *See In re Nehemiah H.*, 2020 WL 3885956, at *10. As DCS correctly states in its brief:

> The termination trial occurred over eleven days at the end of 2019 and January 2020. This Court affirmed the severe-abuse finding in the dependency-and-neglect in July 2020. And the appeal was closed in September 2020. Several months later, in April 2021, the trial court entered the termination order[s] which specifically referenced and incorporated this Court's July 2020 opinion.

As such, the finding of severe abuse in the dependency and neglect action became a final and non-appealable ruling prior to the entry of the final orders in the two termination cases now on appeal. Therefore, the issue of severe child abuse is res judicata and cannot be relitigated. *See In re Collwynn J.*, No. E2020-00726-COA-R3-PT, 2020 WL 7319549, at *5–6 (Tenn. Ct. App. Dec. 11, 2020) (affirming ground based on res judicata finding of severe abuse); *accord In re Trinity S.*, No. E2021-00098-COA-R3-PT, 2021 WL 3486188, at *6 (Tenn. Ct. App. Aug. 9, 2021), *perm. app. denied* (Tenn. Oct. 18, 2021). Accordingly, we affirm the trial court on this ground.

The foregoing notwithstanding, and although Mother only challenged the ground of severe abuse on the basis of res judicata, it is important to note the trial court also found that the petitioners' additional evidence introduced at trial by DCS and/or Amelia and Matthew H. proved by clear and convincing evidence that Mother, by her acts and omissions, perpetrated severe child abuse against Josiah, Nehemiah, and Jonathan.

Severe abuse, as relevant to this case, is defined as:

(i)     The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

- 10 -

(ii)   "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);

Tenn. Code Ann. § 37-1-102(b)(27)(A). Serious bodily injury "includes, but is not limited to, . . . injuries to the skin that involve severe bruising . . . including those sustained by whipping children with objects." Tenn. Code Ann. § 39-15-402(c).

As DCS notes in its brief, there is clear and convincing evidence Mother subjected Josiah, Nehemiah, and Jonathan to severe physical and emotional abuse. Specifically, with Mother's knowledge and consent, Father beat the boys with wooden objects and a metal spoon on their legs, backs, and hands multiple times a day. Moreover, Mother participated in some of these beatings and encouraged Father to beat the children. Mother also hit the older children with a ruler and a stick. In particular, Nehemiah's hand was beaten until it turned purple and swelled to the size of a softball or baseball, and his buttock bled from the beatings. Although Mother denied participating in the beatings, she admitted to witnessing Father's actions and doing nothing to stop him.

Having considered the foregoing and additional evidence in the record, we find the record contains clear and convincing evidence to support the trial court's finding that Mother subjected her children to severe abuse.

Accordingly, we affirm the trial court's finding that the ground of severe child abuse under Tennessee Code Annotated § 36-1-113(g)(4) was established on the basis of res judicata as well as the additional proof introduced at trial in these proceedings concerning Mother's severe abuse of the children.

## B.  Persistence of Conditions

Mother contends the trial court erred in finding that Amelia and Matthew H. proved the ground of persistent conditions.[8]

Under Tennessee Code Annotated § 36-1-113(g)(3)(A), parental rights may be terminated when the child has been removed from the parent's custody for six months as a result of an adjudication of dependency and neglect and three factors exist:

(i)   The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return

---

[8] As a threshold matter, we note that DCS did not allege this ground in its petition; only Amelia and Matthew H. petitioned the court to terminate Mother's parental rights on the ground that she failed to remedy the conditions that led to the removal of Hope and Malachi from her care. *See* Tenn. Code Ann. § 36-1-113(g)(3).

to the care of the parent or guardian;

(ii)      There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii)     The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home . . . .[9]

The purpose of this ground is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015). As the statute prescribes, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (quoting *In re A.R.*, 2008 WL 4613576, at *20). Further, "[w]here . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id*. (quoting *In re A.R.*, 2008 WL 4613576, at *20).

Hope and Malachi were removed from Mother's care and custody by an order entered on June 14, 2017, at which time they were placed in the custody of relatives, Amelia and Matthew H. The court found that removal was necessitated, in principal part, due to an immediate threat to their health and safety while in Mother's custody.

Since their removal, Hope and Malachi have remained in the care and custody of Amelia and Matthew H. Furthermore, pursuant to an adjudicatory order entered on October 18, 2017, the children were declared dependent and neglected. Thus, Hope and Malachi had been removed from Mother's care and legal custody for more than six months and had been adjudicated dependent and neglected, satisfying the conditions precedent under § 113(g)(3).

The trial court set forth specific findings of fact and conclusions of law in its order terminating Mother's parental rights. With regard to the first two factors relevant to this ground, the trial court stated:

[Mother] has her own place to live, a job, a reliable vehicle, divorced [Father], and is regularly attending counseling . . . [T]he biggest issue in this

---

[9] Tennessee Code Annotated § 36-1-113(g)(3) requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

case centers around the brutal abuse and torture of her children. As to that issue, there is little in the record which would be in her favor. [Mother] failed, after 16 months of counseling, to testify with any real specificity regarding her plan to address problems with her children should they arise. . . . There's nothing in the record that would indicate that she would do [anything] any differently today . . . .

Relying, in part, on the testimony of the children's counselors and Mother's counselor, Dr. Leventhal, the court noted the "great lengths" that Mother went to in order to cover up the abuse. Most notably, Dr. Leventhal originally testified that Mother had been forthcoming during her counseling in an effort to make lasting change, and that Mother had been continuing to make progress. The trial court, however, found it significant that, on recall, Dr. Leventhal testified that, until trial, she was unaware of the nature and extent of Mother's role in the abuse because Mother had not been forthcoming during her therapy sessions. Ultimately, the trial court found that Mother had been misleading Dr. Leventhal for "over 16 months covering 70 to 80 one-hour sessions of counseling." Even more, both Mr. Herman and Ms. Cross testified that Mother's failure to be transparent about her role in the abuse made them pessimistic about the possibility of successful reunification. Further, the trial court noted that Mother "seemed to blame everyone else but her own actions for what was happening in this case," and the court reiterated that it did not believe Mother "really think[s] [she] did anything wrong in the first place."

Similarly, the trial court noted that Mother had not been honest in her testimony. Specifically, Mother testified that she told Dr. Leventhal about smearing human feces on one of the children; however, Mother later denied ever smearing feces on any of the children. Mother also testified that she only locked the boys in closets at night because she was afraid they would touch each other; however, Mother later denied ever locking the boys in closets. Mother then testified that the boys were locked in closets, but that she never placed multiple locks on the closets. Mother also denied participating in the beatings; however, Mother acknowledged that Father beat the children and that she made no effort to stop him. Mother also testified that she believed her children "were going to be child molesters," and she justified the abuse by stating that the beatings happened only because she and Father were trying to stop the boys from becoming pedophiles.

Regarding the third statutory factor, the trial court noted that Hope and Malachi were healthy, thriving, and bonding with Amelia and Matthew H., who wished to adopt both children. The court went on to find that the continuation of a relationship with Mother greatly diminished Hope and Malachi's chances of integration into a safe and stable home.

For these and other reasons, the trial court found that Amelia and Matthew H. had proven each of the three statutory factors. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)–(iii); *see also In re Dakota C.R.*, 404 S.W.3d at 499 ("Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective,

the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." (quoting *In re A.R.*, 2008 WL 4613576, at *20)).

The foregoing notwithstanding, Mother contends the trial court erred in finding that conditions persisted which would prevent the safe return of Hope and Malachi to her care. In making this argument, Mother asserts that there is sufficient evidence in the record "to show that [Mother] was very active in remedying the conditions that lead to removal." To support this contention, Mother notes that she divorced Father; has a reliable job; obtained suitable housing; has her own vehicle; participated in parenting classes; participated in hours of counseling; and "utilized the services of the YWCA for their insight into dealing with domestic violence, of which [Mother] too, was a victim." Mother argues that she has utilized these tools to ready herself for the children to return home. Mother testified that she had a desire for both Hope and Malachi to return to public school and that, should they return home, she would continue counseling for her, Hope, and Malachi. According to Mother, all of these facts, taken together, "clearly show that she had removed many, if not all, of the conditions that le[d] to the children's removal," and that Mother is ready, willing, and able to continue her relationship with both Hope and Malachi.

After careful review of the record, we have determined that the evidence does not preponderate against the trial court's findings of fact. Although Mother made some positive changes in her life, the most significant factors to consider are her lack of candor with her counselors as well as her persistent refusal to fully acknowledge her role in the abuse of her children. Considering these and other facts in the record, we find more than sufficient evidence to clearly and convincingly prove the ground of persistence of conditions. *See In re Katrina S.*, No. E2019-02015-COA-R3-PT, 2020 WL 5269236, at *7–8 (Tenn. Ct. App. Sep. 3, 2020) (explaining that "Mother's refusal to acknowledge [the] deficiencies in her parenting" along with Mother's "unwillingness to accept any responsibility" was sufficient to support termination based on the ground of persistence of conditions).

Accordingly, we affirm the trial court's ruling on this ground.

## II. BEST INTEREST ANALYSIS

Mother contends the trial court erred by finding that it was in the children's best interests for her parental rights to be terminated.

Tennessee Code Annotated § 36-1-113(i) identifies factors to be considered when analyzing whether termination of parental rights is in a child's best interest; however, these "factors are illustrative, not exclusive," and the parties are free to offer proof of any other relevant factor to the analysis.[10] *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In

---

[10] The petitions at issue were filed prior to April 22, 2021, at which time Tennessee Code Annotated § 36-1-113(i) identified nine factors for consideration. The statute was subsequently amended and it now

- 14 -

*In re Gabriella D.*, the Tennessee Supreme Court summarized the law pertaining to this analysis:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ."

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

531 S.W.3d at 681–82 (alterations in original) (citations omitted).

"The child's best interests must be viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citations omitted). "When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d). The trial court set forth findings of fact regarding the factors it deemed applicable, and we review those findings below.

### A. Adjustment of Circumstance

The first factor to be considered in determining whether termination is in a child's best interest is "[w]hether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home

includes additional factors that should be considered, if relevant. *See* 2021 Tenn. Pub. Acts, c. 190, § 1 (effective Apr. 22, 2021). Because the amended statute applies only to petitions for termination filed on or after April 22, 2021, the new factors do not apply to the present case.

of the parent or guardian." Tenn. Code Ann. § 36-1-113(i)(1).

The trial court found that while Mother had "certainly made dramatic changes in her life," Mother's continued efforts to cover up her role in, and the extent of, the abuse showed that Mother had not made a true adjustment of conduct. As previously mentioned, Dr. Leventhal testified that Mother had not been transparent about the extent of the abuse or her role in the abuse during any of her therapy sessions, and Mother offered conflicting testimony regarding the abuse.

Moreover, the court expressed its concern that, despite months of therapy, Mother was unable to testify "with any real specificity regarding her plan to address problems with her children should they arise." Significantly, this is true despite the fact that Mother had, as the trial court stated, "one of the most extensive support groups of any parent . . . in a DCS case." Finally, the court found it significant that Mother "seemed to blame everyone else but her own actions for what was happening in this case." For this reason, the court determined that it believed it difficult for Mother to make lasting change, as she did not seem to think she had done anything wrong in the first place. Significantly, both Mr. Herman and Ms. Cross testified that, in their experience, Mother's failure to take responsibility for her own parenting issues demonstrated that she would be unable to effect lasting change in how she interacted with the children.

Thus, although Mother changed some of the conditions that led to removal, the evidence does not preponderate against the trial court's finding that this factor weighs in favor of termination.

## B.  Lasting Adjustment

The second factor to consider is "[w]hether the parent . . . has failed to effect a lasting adjustment . . . for such a duration of time that lasting adjustment does not reasonably appear possible." Tenn. Code Ann. § 36-1-113(i)(2).

The trial court found that Mother failed to recognize or disclose her role in the abuse as well as its extent, and that Mother continued to blame others for her own treatment of her children. Thus, Mother failed to demonstrate a lasting adjustment on her part, as evidenced by her continuing to evade responsibility even during trial. Having determined that the evidence does not preponderate against the trial court's findings, we agree that this factor weighs in favor of termination.

## C.  Regular Visitation or Contact

The third factor to be considered is "[w]hether the parent . . . has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3).

The trial court found that Mother had attempted to maintain regular visitation with

the children "as much as it was possible." For this reason, the trial court determined that this factor weighed against termination. In that the evidence does not preponderate against the trial court's findings, we agree that this factor weighs against termination.

## D. Meaningful Relationship

The fourth factor to be considered is "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." Tenn. Code Ann. § 36-1-113(i)(4).

As the trial court noted, "this factor is somewhat different for each child." Specifically, each of the older children—Josiah, Jonathan, Nehemiah, and Hadassah—testified that they did not feel any bond with Mother and they did not wish to have any contact or relationship with Mother. As for the younger children—Nathaniel, Noah, Obadiah, Grace, Hope, and Malachi—their therapists provided significant testimony to establish that there was little relationship or bond between them and Mother. Mr. Herman, who performed psychological evaluations on both parents as well as each of the children, testified regarding the younger children's opinions of Mother. When asked about the potential for successful reunification, Mr. Herman testified that while Hope seemed somewhat positive about the potential for reunification, Nathaniel expressed "quite a bit of stress related to the situation with his parents." Finally, the trial court noted that, in its opinion, the strongest bond the children had was with each other, followed closely by their relationship with their current caregivers.

Having determined that the evidence does not preponderate against the trial court's findings, we agree that this factor weighs in favor of termination.

## E. Change of Caretakers and Physical Environment

The fifth factor to be considered is "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5).

The trial court determined that this consideration was "a huge factor" in this case. The court went on to note that nearly every witness, including each of the children's therapists and Mr. Herman, who performed the children's initial psychological evaluations, was of the opinion that moving the children away from their current caretakers would be devastating to them. Moreover, and significantly, while Dr. Leventhal testified as to her belief that the children should be reunited with Mother, she only testified to her belief that reunification was in **Mother's** best interest and did not express a clear opinion as to what was in the children's best interests. *See In re Gabriella D.*, 531 S.W.3d at 681 ("When considering these statutory factors, courts must remember that '[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." (citation omitted)).

- 17 -

In addition to the children's therapists, each of the older children who testified expressed that they did not wish to be removed from their current caretakers. As the trial court noted, the children are "bonded there, they feel safe there, they're involved, and thriving educationally, psychologically, and emotionally."

Having determined that the evidence does not preponderate against the trial court's findings, we agree that this factor weighs in favor of termination.

### F. Abusive Behavior

The sixth factor to be considered is "[w]hether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(5).

As previously discussed, witnesses presented substantial evidence regarding the severe abuse inflicted by Mother and Father. Moreover, Mother was found to have severely abused the children, as defined in Tennessee Code Annotated § 37-1-102, in the prior dependency and neglect action. For these reasons, we agree with the trial court that this factor weighs in favor of terminating Mother's parental rights.

### G. Physical Environment of Parent's Home

The seventh factor to be considered is

[w]hether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner.

Tenn. Code Ann. § 36-1-113(i)(7).

The trial court stated that it was not overly concerned about Mother's use of alcohol or drugs; however, the court found that Mother could not provide a healthy and safe environment.

As previously discussed, the trial court placed significant emphasis on the fact that Mother was not honest about the extent of the abuse or her role in the abuse. Her concealment and dishonesty also prompted Mr. Herman to testify that he had significant reservations about successful reunification. Mr. Herman also testified that Mother's actions demonstrated that she willingly participated in the abuse. Ms. Cross testified regarding similar concerns. Furthermore, Mother was unable to clearly testify as to how she planned to discipline the children should they be returned to her care. For these reasons, the trial court stated that it did not think Mother truly believed she had done anything wrong and that there was nothing to indicate she would do anything different in the future.

Having determined that the evidence does not preponderate against the trial court's findings, we agree that this factor weighs in favor of termination.

## H. Mental and Emotional State

The eighth factor to be considered is "[w]hether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child." Tenn. Code Ann. § 36-1-113(i)(8).

The trial court found that this factor weighed in favor of terminating Mother's parental rights. In making this determination, the court found that, while she appeared to have made "significant mental health strides," other evidence demonstrated that she was "as manipulative and culpable as [Father]." To support this contention, the trial court once again found it significant that Mother had concealed the extent of the abuse from Dr. Leventhal and pointed out Mr. Herman and Ms. Cross's testimony in which they determined that Mother's continued concealment was a significant "red flag." For these reasons, the court determined that Mother's underlying mental health issues had not been remedied such that it believed she could consistently care for the children in a safe manner.

Because the evidence does not preponderate against these findings, we agree with the trial court that this factor weighs in favor of termination.

## I. Child Support

The ninth factor to be considered is "[w]hether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101." Tenn. Code Ann. § 36-1-113(i)(9).

Mother made routine child support payments throughout the children's respective custodial episodes. Thus, we agree with the trial court that this factor weighs against termination.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Amy H.

_____
FRANK G. CLEMENT JR., P.J., M.S.